**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

**Jane Doe (TS-00003), an individual,**

**Plaintiff,**

**v.**

**G6 HOSPITALITY, LLC;**
**MOTEL 6 OPERATING, L.P.;**
**G6 HOSPITALITY PROPERTY LLC;**
**G6 HOSPITALITY FRANCHISING LLC;**

**Defendants**

**Case No.:**

**PLAINTIFF'S ORIGINAL COMPLIANT AND JURY DEMAND**

1. **Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595**
2. **Child Abuse Victims' Rights Act, 18 U.S.C. § 2255**
3. **New Mexico Human Trafficking Civil Remedy, N.M. Stat. § 30-52-1.1**

## NATURE OF THE ACTION

1. This case arises from the commercial sexual exploitation of a homeless fifteen-year-old child at two Motel 6-branded properties in Albuquerque, New Mexico. Plaintiff's traffickers used Defendants' rooms, staff, surveillance, reservation systems, and lodging services as essential infrastructure for a trafficking venture that generated room revenue and other financial benefits for Defendants.
2. This case is not based only on generic signs of commercial sex. Rather, it has all the classic indicia of trafficking but also a specific instance in which the Plaintiff, a child, asked hotel staff for help, intervention, and was refused.
3. At the 1701 University Boulevard property, while in distress, Plaintiff approached a Motel 6 housekeeper asking for help. Plaintiff warned the employee that the traffickers would hurt her if they learned she had sought assistance. The housekeeper laughed and walked away.

Plaintiff's trafficker appeared almost immediately seized Plaintiff, confined her in a bathroom for hours, and beat her severely.

4. The same property's front-desk staff monitored Plaintiff for her traffickers, agreed to notify them if she attempted to leave, and acted as a lookout for police during drug transactions. Plaintiff was visibly a teenager, was controlled by older men, was subjected to repeated beatings, received approximately three to six older male commercial-sex purchasers per day, and was one of several young girls being exploited from multiple rooms.
5. At the 13141 Central Avenue property, Plaintiff was likewise housed and sold for sex while underage and under the visible control of her traffickers.
6. Contemporaneous public complaints during Plaintiff's trafficking period expressly reported prostitution and drug dealing at the Central Avenue property. A Motel 6 brand representative responded to one such complaint within two days, invoked Motel 6 safety-and-security standards, and directed the reviewer to corporate Guest Relations, supporting an inference that brand-level systems received, monitored, or had ready access to property-specific complaints.
7. Plaintiff seeks relief under the civil remedy provision of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595; the Child Abuse Victims' Rights Act ("CAVRA"), 18 U.S.C. § 2255, based on violations of 18 U.S.C. § 1591 committed against her while she was a minor; and New Mexico's human-trafficking civil-remedy statute, N.M. Stat. § 30-52-1.1.
8. Plaintiff sues each Defendant only for its own alleged conduct, benefits, knowledge, and legally attributable acts. G6's former Chief Financial Officer has described the historical division between corporate-owned and franchisee-owned motels and the functions of G6 Hospitality, Motel 6 Operating, G6 Property, and G6 Franchising. Plaintiff incorporates that entity-specific structure here. What remains to be confirmed is the property-specific application of that structure—particularly whether 1701 University was corporate-owned during each relevant stay, which subsidiary held title or lease rights and employed the responsible staff, and the identity of the historical franchisee/owner/operator of 13141

Central. Plaintiff pleads only those unresolved property-specific roles in the alternative under Federal Rule of Civil Procedure 8(d).

**PARTIES**

9. Plaintiff, identified as Jane Doe (TS-00003), is an adult survivor of child sex trafficking. She was fifteen years old when her trafficking began and she remained a minor during a substantial portion of the conduct alleged. She proceeds under a pseudonym because this action concerns childhood sexual exploitation, physical and sexual abuse, substance dependency, sexually transmitted infections, and ongoing severe psychological injuries. Plaintiff is filing a contemporaneous motion for leave to proceed under a pseudonym.

10. Defendant G6 Hospitality, LLC ("G6 Hospitality") is a Delaware limited liability company whose principal operational headquarters is in Plano, Collin County, Texas. During the relevant period its principal business offices were in Carrollton, Denton County, Texas. G6 Hospitality employed corporate-level personnel, not property-level hotel employees. For corporate-owned G6 hotels, G6 Hospitality performed oversight functions, including developing policies and training and managing the reservation system. For franchised properties, G6 Hospitality provided franchisees certain brand materials and resources and services including marketing and access to the reservation system. Plaintiff does not allege that G6 Hospitality itself owned the subject hotel real estate or directly employed the housekeepers, front-desk personnel, maintenance workers, or general managers at the subject properties.

11. Defendant Motel 6 Operating, L.P. ("Motel 6 Operating") is a Delaware limited partnership that, during the relevant period, provided staff and assets to corporate-owned Motel 6 and Studio 6 properties. Motel 6 Operating employed certain on-site personnel at corporate-owned locations, including housekeepers, front-desk Guest Services Representatives, maintenance workers, and General Managers, and also owned or leased some properties operated as corporate-owned motels. Motel 6 Operating did not employ on-site employees, own or lease real property, or receive operating revenue at third-party franchisee-owned

motels. Plaintiff therefore asserts claims against Motel 6 Operating only to the extent 1701 University was a corporate-owned location during Plaintiff's trafficking there.

12. Defendant G6 Hospitality Property LLC ("G6 Property") is a Delaware limited liability company that, during the relevant period, held title to or leases for properties at which corporate-owned Motel 6 or Studio 6 motels operated and earned revenue from the operation of those corporate-owned properties. G6 Property did not own, lease, operate, or receive revenue from third-party franchisee-owned motels. Plaintiff therefore asserts claims against G6 Property only to the extent historical title, lease, or corporate asset records establish that it held the 1701 University property during Plaintiff's trafficking there.

13. Defendant G6 Hospitality Franchising LLC ("G6 Franchising") is a Delaware limited liability company headquartered in Texas and was the entity that entered into Motel 6 and Studio 6 franchise agreements in the United States. G6 Franchising did not employ property-level personnel and did not itself own, lease, or operate hotel properties. Plaintiff asserts claims against G6 Franchising as to 13141 Central based on its role as the franchisor and the franchise-system relationship, benefits, standards, and services alleged below, not on any allegation that it directly employed the hotel staff or owned that property.

14. The historical division of responsibility among the G6 entities is material and is pleaded separately. According to G6's former Chief Financial Officer, corporate-owned motels and franchisee-owned motels operated under distinct structures: at corporate-owned motels, fully owned G6 subsidiaries owned or leased the physical assets and employed hotel staff; at franchisee-owned motels, the third-party franchisee owned or leased the assets and staffed the motel. Plaintiff accordingly does not rely on corporate affiliation alone and does not allege that an entity performed a function that G6's own identified corporate structure assigns to another entity.

15. At all relevant times, each property employee whose conduct is alleged acted within the course and scope of assigned hotel functions, including guest monitoring, housekeeping, room access, front-desk operations, security observation, communications with registered guests, and control of hotel premises. To the extent 1701 University was corporate owned during Plaintiff's trafficking, Plaintiff alleges that the responsible G6 operating entity or

entities are liable for those employees' conduct under respondeat superior, agency, apparent authority, ratification, and other applicable principles. As to 13141 Central, Plaintiff does not attribute franchisee employees' conduct to Motel 6 Operating or G6 Property.

16. At all relevant times, each property employee whose conduct is alleged acted within the course and scope of assigned hotel functions, including guest monitoring, housekeeping, room access, front-desk operations, security observation, communications with registered guests, and control of hotel premises. The operating Defendants are liable for those employees' conduct under respondeat superior, agency, apparent authority, ratification, and other applicable principles.

## JURISDICTION AND VENUE

17. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under 18 U.S.C. §§ 1591, 1595, and 2255.
18. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's New Mexico statutory claim because it arises from the same case or controversy as the federal claims.
19. This Court has personal jurisdiction over the named G6 Defendants. G6 Hospitality and G6 Franchising maintained their principal operational headquarters or principal business offices in Texas. Motel 6 Operating and G6 Property were affiliated G6 entities whose principal business offices were maintained with the G6 enterprise in Texas and whose alleged property, staffing, operating, and revenue functions were directed through that enterprise. Plaintiff alleges personal jurisdiction based on each Defendant's own Texas contacts and does not rely solely on corporate affiliation.
20. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (c)(2), and (d) because the named G6 Defendants reside in Texas and, on information and belief, each had sufficient contacts with the Eastern District of Texas to be deemed a resident of this District. G6's current Plano headquarters is in Collin County, and its former Carrollton offices were in Denton County; both counties are within the Sherman Division.

21. Venue is also authorized for the CAVRA claim by 18 U.S.C. § 2255(c), subject to the venue requirements of 28 U.S.C. § 1391.

**THE SUBJECT PROPERTIES AND DEFENDANTS' ROLES**

22. The first subject property is located at 1701 University Boulevard NE, Albuquerque, New Mexico 87102 ("1701 University"). Plaintiff presently remembers the property as Studio 6 Albuquerque Midtown. Public historical sources, however, identify the same address during the relevant period as Motel 6 Albuquerque Midtown. Plaintiff therefore pleads the property by address and alleges that it operated within the G6 Motel 6/Studio 6 system, regardless of the brand name used on a particular date.
23. Based on G6's identified historical corporate structure, if 1701 University was a corporate-owned G6 property during Plaintiff's trafficking there, the property would have been owned or leased by a fully owned G6 subsidiary and staffed by employees of a fully owned G6 subsidiary. Plaintiff alleges, subject to confirmation through property-specific records, that Motel 6 Operating supplied or employed on-site personnel at 1701 University and/or owned or leased the property, and that G6 Property held title to or a leasehold interest in the property and earned revenue from its operation. G6 Hospitality performed corporate-level oversight, policy, training, and reservation-system functions for corporate-owned properties. Plaintiff pleads these property-specific roles subject to production of deeds, leases, payroll records, property-management-system records, and corporate asset schedules.
24. The second subject property is Motel 6 Albuquerque Northeast, located at 13141 Central Avenue NE, Albuquerque, New Mexico 87123 ("13141 Central"). On information and belief, 13141 Central was a third-party franchisee-owned Motel 6 during at least part of Plaintiff's trafficking period. Plaintiff therefore does not allege that Motel 6 Operating or G6 Property owned, staffed, operated, or received operating revenue from 13141 Central during any period in which it was franchisee-owned. G6 Franchising was the Motel 6 franchisor, and G6 Hospitality supplied franchisees certain brand materials and resources and services including marketing and access to the reservation system.

25. For 13141 Central, Plaintiff alleges that G6 Franchising participated in and benefited from the franchise relationship under the applicable franchise agreement and that G6 Hospitality supplied franchise-system services and resources, including marketing and reservation-system access. Plaintiff further alleges, based on the contemporaneous brand-level response to an express prostitution-and-drug complaint described below, that Motel 6 maintained brand-level Guest Relations or customer-service channels through which property-specific safety complaints were received, monitored, escalated, or made available to responsible corporate personnel. Plaintiff will amend to identify the historical local franchisee/owner/operator when confirmed through reliable records or discovery.
26. The responsible Defendants and property operator had the ability, according to their respective functions, to obtain or preserve guest folios, reservation histories, payment records, registered-guest data, room-assignment records, complaint records, quality-assurance materials, incident reports, surveillance information, and communications concerning the properties. Plaintiff does not allege that every Defendant possessed every category of record. Rather, discovery is expected to identify which entity maintained each relevant system or record during the trafficking period.

## PLAINTIFF'S VULNERABILITY, RECRUITMENT, AND COERCION

27. At the age of fifteen Plaintiff became homeless and was living on the streets, unprotected.
28. An adult male trafficker known to Plaintiff as "D" approached her and exploited that vulnerability. He promised her shelter, security, and care. Desperate for a place to stay, Plaintiff went with him.
29. Once Plaintiff was isolated, D told her that she belonged to him, that nobody would come for her, that the money generated through her exploitation belonged to him, and that she had no choice about what she would be made to do.
30. D was approximately twenty-one years old and initially acted as though he were a romantic interest to Plaintiff.
31. An associate known as "E," a significantly older male, assisted in operating the trafficking venture and was often responsible for driving Plaintiff between locations.

32. D and E advertised Plaintiff for commercial sex on Backpage, Craigslist, Skip the Games, and Facebook while she was underage. They sometimes used the name "ST" as an alias or stage name for Plaintiff..
33. The traffickers maintained control through repeated physical violence, sexual abuse, and psychological manipulation. Plaintiff lived inisolation, and all the money she earned was confiscated by her traffickers.
34. The traffickers supplied Plaintiff with Xanax and methamphetamine, compelled alcohol use, and later fostered a heroin dependency that made escape more difficult.
35. Plaintiff was visibly a teenager. Commercial-sex purchasers repeatedly commented that she looked like a baby or could not be eighteen. Plaintiff was forced to persuade them that she was older and was beaten if she failed.
36. In the midst of the vicious beatings, the traffickersrepeatedly reminded her that no one would help her and that she belonged to them.

**TRAFFICKING AT 1701 UNIVERSITY**

37. 1701 University was the first hotel property from which Plaintiff was trafficked. At the initial check-in, the traffickers left Plaintiff in the vehicle while they entered the front office, completed the check-in process, and returned to escort her to a room.
38. Plaintiff was kept in a room at the property under the traffickers' control and was made available to older male commercial-sex purchasers. During the trafficking period, the venture arranged approximately three to six purchasers per day, with short visits and repeated men entering and leaving Plaintiff's room at unusual hours.
39. Plaintiff actively sought help from a housekeeper at 1701 University. Plaintiff told the housekeeper that she needed help and that the traffickers would hurt her if they learned she had asked for assistance.
40. The housekeeper—a middle-aged woman —did not summon law enforcement, hotel security, medical help, child protective services, or management. Instead, she chuckled or laughed and walked away.

41. Almost immediately after the housekeeper left, D arrived and seized Plaintiff. The timing supports a reasonable inference that the housekeeper or another employee alerted D or enabled him to locate Plaintiff. Discovery is expected to reveal the employee's communications and movements.
42. D forced Plaintiff back to the room, confined her in the bathroom for approximately four hours, and then punched, kicked, and struck her with belts until she fell to the floor and could not protect herself.
43. During that beating, D told Plaintiff in substance: "No one's going to help you. These are all my people. No one cares about you, and they're not going to help you." The statement, the employee's response, and D's immediate arrival reinforced Plaintiff's belief that hotel personnel were aligned with the traffickers and that escape was futile.
44. Plaintiff observed numerous other young girls at 1701 University accompanied and controlled by men she understood to be pimps. The girls appeared to be in circumstances similar to Plaintiff's. Plaintiff met another trafficked girl, "B," who discussed escaping and attempted to help Plaintiff escape.
45. D and E controlled at least two other girls who interacted with Plaintiff and helped her dress for commercial-sex encounters. The traffickers maintained at least four additional rooms at the property beyond the room in which Plaintiff was kept.
46. The use of multiple rooms, the presence of multiple controlled young girls, the repeated arrival of older men for brief visits, and the traffickers' ongoing presence created a continuous and observable operation—not an isolated overnight stay or a single ordinary room rental.
47. After Plaintiff's failed attempt to obtain help, one of the traffickers told her that the front-desk employee would telephone D or E if Plaintiff tried to leave or go outside without permission. The traffickers also guarded her room and monitored her movements.
48. Plaintiff remembers a front-desk employee who went by "Mike." She understood that Mike watched Plaintiff and other activity for the traffickers. Plaintiff observed or learned that Mike also watched for police while visible drug transactions or drug use occurred at the property.

49. The housekeeper's direct notice, the alleged front-desk monitoring, the traffickers' multiple rooms, the visible confinement and violence, Plaintiff's apparent minority, the stream of older male purchasers, the presence of other controlled young girls, and the drug activity gave operating personnel actual knowledge—or at minimum reckless disregard and constructive knowledge—that Plaintiff was a minor being subjected to commercial sexual exploitation.

50. Property employees nevertheless continued providing rooms, access, monitoring, concealment, and communications that maintained Plaintiff at the property and made the trafficking venture safer and more profitable for D and E.

**TRAFFICKING AT 13141 CENTRAL**

51. D and E also trafficked Plaintiff from rooms at 13141 Central while she was a teenager. They controlled her movements, retained the proceeds, transported her to and from the property, and caused older men to enter the room for commercial-sex acts.

52. At 13141 Central, as throughout Plaintiff's trafficking, Plaintiff's youth, fear, dependency, control by older men, short visits by multiple purchasers, and absence of freedom were observable to personnel performing ordinary front-desk, housekeeping, security, and premises functions.

53. Plaintiff does not presently attribute the 1701 University housekeeper, "Mike," police-lookout, or immediate-retrieval allegations to 13141 Central. Her claim as to 13141 Central rests on her trafficking at that property, the observable plaintiff-specific indicators, the repeated lodging transaction, and property- and brand-specific notice described below.

**CONTEMPORANEOUS PROPERTY-SPECIFIC NOTICE**

54. During Plaintiff's trafficking period, travelers posted public complaints specifically identifying prostitution, drug dealing, police activity, and security problems at 13141 Central. These public reports are alleged as notice and as evidence of information

available to Defendants—not as conclusive proof that every reported event occurred exactly as described.

55. A July 2015 review reported men arriving with women described as "hookers" during the early morning hours. A May 2015 review described drug-related conditions and apathetic staff. These reports preceded or occurred during the period in which Plaintiff was being exploited as a minor.

56. On September 19, 2015, a traveler reported that police had been at 13141 Central on two nights and expressly warned that prostitutes and drug dealers used the motel.

57. On September 21, 2015, an account identified as a Motel 6 "brand experienced team member" responded to that review. The response stated that safety and security were high priorities under Motel 6 standards and directed the reviewer to Motel 6 Guest Relations to record details. The prompt brand-level response supports an inference that Defendants monitored, received, escalated, or had access to property-specific online complaints and maintained centralized systems for security-related guest information.

58. Albuquerque Police Department records also document an attempted-murder shooting inside a room at 13141 Central on July 24, 2016, witnessed by children ages six and nine. The incident does not by itself prove trafficking, but it corroborates serious property-specific criminality and police activity during the same general period.

59. At 1701 University, an October 2015 public review reported drug dealing throughout the night and described the property as unsafe. Again, Plaintiff alleges the review as evidence of property-specific information available to Defendants, not as proof of every reported detail.

60. Albuquerque Police Department records further state that, on January 7, 2016, detectives received a tip that a vehicle associated with multiple armed robberies was at the Motel 6 located at 1701 University. Police observed a suspect leave the property and commit another armed robbery. This incident likewise corroborates recurring, observable criminal activity at the property during Plaintiff's trafficking period.

61. These public reports and police incidents were cumulative of what property personnel directly observed: vulnerable young girls, older controlling men, multiple rooms, short

visits, drugs, violence, and attempts to escape. They increased the reason for Defendants to investigate, train, monitor, intervene, and preserve information concerning trafficking indicators at the subject properties.

**INDUSTRY AND CORPORATE AWARENESS**

62. By March 2015, Polaris publicly reported that 1,434 hotel- and motel-related trafficking cases had been reported to the national hotline and related channels since 2007. Polaris explained that traffickers used hotel rooms to arrange commercial-sex “dates” and exploited a lack of awareness among hotel staff, managers, and executives.

63. By February 2016, Polaris publicly identified hotel-specific indicators closely matching Plaintiff’s circumstances: a teenage girl with an older man, cash or anonymous room rentals, short visits by a string of men, evidence of threats or physical violence, fearful or submissive behavior, excessive foot traffic, constant monitoring, lack of freedom of movement, and extended stays with few possessions.

64. Those materials were public and contemporaneous. They are not a substitute for plaintiff-specific notice. Here, however, they make the direct plea for help, visible minority, beatings, multiple controlled girls, repeated older male visitors, restricted movement, and staff monitoring readily recognizable as trafficking rather than merely consensual commercial sex.

65. Defendants knew that housekeeping and front-desk employees had unique access to rooms, guests, traffic patterns, and requests for assistance. Defendants also knew that the properties’ reservation, complaint, quality-assurance, and security systems could identify repeated or unusual activity.

66. On information and belief, Defendants failed to implement or enforce effective trafficking-recognition, escalation, victim-safety, and law-enforcement-contact procedures at the subject properties during the relevant period or ignored violations of such procedures. At 1701 University, the failure was not merely ineffective training: personnel allegedly affirmatively returned Plaintiff to the traffickers’ control, monitored her, and protected the operation from police detection.

## DEFENDANTS' PARTICIPATION AND FINANCIAL BENEFITS

67. D and E's trafficking operation constituted a venture involving repeated commercial transactions, risk, and profit. The hotel lodging component of that venture depended on rooms, privacy, access control, guest-registration services, housekeeping, parking, front-desk communications, and the ability to receive numerous purchasers without interruption.

68. At 1701 University, the responsible property-level employer and operator participated in the lodging venture by repeatedly renting and maintaining rooms for D and E, including multiple simultaneous rooms; allowing traffickers and purchasers access; maintaining Plaintiff on the premises; and, through on-site personnel, monitoring Plaintiff, communicating with the traffickers, declining her direct plea for help, and acting as a lookout against police intervention. If 1701 University was corporate-owned at the relevant time, G6's own corporate structure places the on-site employment and property functions with Motel 6 Operating and/or another fully owned G6 subsidiary, while G6 Hospitality performed corporate-level oversight, policy, training, and reservation-system functions.

69. Those acts went beyond an ordinary, arms-length room rental. They supplied assistance, support, concealment, and facilitation to a continuous trafficking operation and furthered the venture's success at the specific property where Plaintiff was exploited.

70. Each named Defendant is alleged to have received financial or other value only according to its pleaded property-specific role. At a corporate-owned property, the relevant title/lease and operating entities earned revenue from the property's operation. At a franchisee-owned property, Motel 6 Operating and G6 Property did not receive operating revenue merely by virtue of affiliation and are not sued on that basis.

71. For 1701 University, Plaintiff alleges that G6 Property and/or Motel 6 Operating benefited from room revenue or the operation of the property to the extent property-specific records confirm their ownership, leasehold, staffing, or operating roles, and that G6 Hospitality benefited from and supported the corporate-owned hotel system through its corporate-level functions. For 13141 Central, Plaintiff alleges that G6 Franchising benefited from

the franchise relationship and that G6 Hospitality provided franchise-system services and resources; Plaintiff does not allege that G6 Property or Motel 6 Operating received revenue from 13141 Central during any franchisee-owned period.

72. The corporate-level participation allegations are likewise entity-specific. G6 Hospitality's alleged role concerns corporate oversight, policies and training, marketing, reservation-system functions, and services or resources provided to franchisees. G6 Franchising's alleged role at 13141 Central concerns the franchise relationship itself. Plaintiff does not allege that G6 Franchising employed hotel personnel or that G6 Hospitality owned the hotel real estate.

73. Plaintiff alleges the corporate role at 13141 Central cautiously and in the alternative. The contemporaneous Motel 6 brand response to an express prostitution-and-drug complaint supports an inference that a brand-level complaint or Guest Relations function received, monitored, escalated, or had access to property-specific information. Discovery is required to determine whether that function was administered by G6 Hospitality, G6 Franchising, another G6 entity, or the franchisee and what information was conveyed to each Defendant.

**DEFENDANTS' KNOWLEDGE**

74. The responsible property-level employer and operator knew or should have known that D and E's venture violated 18 U.S.C. § 1591 because on-site personnel observed, were told of, or recklessly disregarded Plaintiff's minority, lack of freedom, fear, injuries, direct request for rescue, confinement, multiple older male purchasers, multiple controlled girls, multiple rooms, drugs, and violence. If 1701 University was corporate-owned, those personnel were employed by the responsible fully owned G6 operating subsidiary, which Plaintiff alleges was Motel 6 Operating subject to property-specific confirmation.

75. For purposes of perpetrator liability, the 1701 University employee conduct supports actual knowledge or reckless disregard. Plaintiff expressly said that she needed help and would be hurt; D appeared immediately; Plaintiff was confined and beaten; staff allegedly

monitored her movements and warned the traffickers; and a front-desk employee allegedly protected criminal activity from police detection.

76. Because Plaintiff was under eighteen during the relevant CAVRA conduct, Defendants were not required to know that force, fraud, or coercion would be used if they knew or recklessly disregarded that she was a minor who would be caused to engage in a commercial sex act. In all events, the direct plea and observable violence also supplied knowledge of force and coercion.

77. The property-specific public complaints and police incidents reinforced the need to recognize and investigate the plaintiff-specific facts. At 13141 Central, the brand's direct response to an express prostitution-and-drug complaint supports an inference that responsible brand-level personnel received or had access to that information. Plaintiff does not allege at this stage that the Ping declarations establish which particular G6 entity received that specific complaint.

78. Defendants' failure to intervene continued despite repeated opportunities. Every room rental, housekeeping visit, front-desk encounter, observed purchaser visit, attempted departure, and security event supplied another opportunity to detect and disrupt Plaintiff's exploitation.

## CAUSATION AND INJURIES

79. The rooms, access, monitoring, concealment, and failure to respond to Plaintiff's direct plea by the responsible property-level actors enabled D and E to maintain control, receive purchasers, avoid detection, punish escape attempts, and continue exploiting Plaintiff. Corporate-level conduct caused or contributed to Plaintiff's injuries to the extent a particular Defendant knowingly participated in, supported, ratified, or continued to benefit from the specific venture despite the entity-specific notice alleged. The trafficking venture would have been materially more difficult, risky, and visible without the subject properties and personnel's assistance.

80. Had the housekeeper or other personnel contacted police, child-protection authorities, emergency medical services, security, or trained management when Plaintiff sought help,

the severe beating that immediately followed and additional trafficking episodes could have been prevented or shortened.

81. As a direct and proximate result, Plaintiff suffered repeated rape and sexual exploitation, severe beatings, physical pain, sexually transmitted infections, substance dependency, post-traumatic stress disorder, anxiety, depression, dissociation, sleep disorders, shame, impaired relationships, lost educational and employment opportunities, economic loss, and recurrent suicidal ideation.

82. Plaintiff has incurred and will continue to incur medical, psychiatric, psychological, substance-use-treatment, housing, and other recovery expenses. Her injuries are severe, permanent, and ongoing.

**COUNT I**

**TVPRA BENEFICIARY LIABILITY — 18 U.S.C. § 1595(a) (Against Each Defendant According to Its Property-Specific Role)**

83. Plaintiff incorporates all preceding paragraphs as though fully set forth here.

84. D and E violated Chapter 77 of Title 18, including 18 U.S.C. § 1591, by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting Plaintiff and causing her to engage in commercial sex acts while she was under eighteen and through force, threats, fraud, and coercion.

85. Each Defendant against whom beneficiary liability is asserted knowingly received financial or other value according to its pleaded property-specific role, including room revenue or operating revenue at a corporate-owned property, or franchise, reservation, marketing, technology, or other system-related value at a franchisee-owned property. Plaintiff does not allege that Motel 6 Operating or G6 Property received revenue from 13141 Central during a franchisee-owned period, nor that G6 Franchising received room revenue as the property owner or operator.

86. At 1701 University, the responsible operating and property Defendants participated by repeatedly providing rooms and services, maintaining Plaintiff at the property, supporting the traffickers' use of multiple rooms, permitting repeated purchaser access, and, through

on-site personnel, providing monitoring, communications, concealment, police-lookout assistance, or other facilitation beyond an ordinary commercial transaction. Plaintiff alleges these functions against Motel 6 Operating and G6 Property only to the extent property-specific records confirm the roles described above.

87. At 13141 Central, Plaintiff alleges against G6 Franchising and G6 Hospitality only the franchise-system and corporate-service participation supported by their respective roles, including the franchise relationship, reservation-system or marketing services, brand resources, complaint channels, and the contemporaneous brand-level receipt of or access to property-specific safety information. Plaintiff does not attribute franchisee employees' acts to Motel 6 Operating or G6 Property.

88. The responsible property-level employer or operator at 1701 University knew or should have known that the venture engaged in conduct violating § 1591 based on the direct request for assistance, observable control and injuries, Plaintiff's apparent minority, repeated purchasers, multiple rooms and girls, staff communications, and cumulative property-specific notice. As to G6 Hospitality and G6 Franchising, Plaintiff alleges knowledge or constructive knowledge only to the extent their own corporate functions, systems, complaint channels, communications, or records supplied them with plaintiff-specific or property-specific information sufficient to satisfy § 1595(a).

89. The acts and omissions of the Defendants shown to satisfy § 1595(a), according to their respective roles, caused or contributed to Plaintiff's injuries. Plaintiff is entitled to compensatory damages, economic and noneconomic damages, punitive damages where permitted, reasonable attorney's fees, costs, and all other relief available under § 1595(a).

**COUNT II**

**TVPRA PERPETRATOR LIABILITY — 18 U.S.C. § 1595(a), PREDICATED ON 18 U.S.C. §§ 1591(a)(1), 1591(a)(2), AND 1594(c) (Against the Responsible Property-Level Employer/Operator at 1701 University and Any Defendant Shown to Have the Requisite Direct Participation and Mental State)**

90. Plaintiff incorporates all preceding paragraphs as though fully set forth here.
91. Through on-site employees and agents at 1701 University, the responsible property-level employer or operator knowingly harbored, maintained, provided, or obtained Plaintiff in or affecting interstate commerce, knowing or in reckless disregard that she had not attained eighteen years and would be caused to engage in commercial sex acts, and knowing or in reckless disregard that force, threats, fraud, or coercion would be used. If property-specific records confirm that Motel 6 Operating employed the housekeeper, front-desk personnel, or other responsible employees during Plaintiff's trafficking, Plaintiff alleges this count against Motel 6 Operating on that basis.
92. The same responsible property-level Defendant or Defendants knowingly benefited from participation in a venture that engaged in those acts, with the actual or reckless-disregard mental state required by § 1591(a)(2). Plaintiff does not assert perpetrator liability against G6 Franchising merely because it entered franchise agreements or against G6 Property merely because it held title, absent facts establishing the requisite direct conduct and mental state.
93. At 1701 University, personnel's direct notice that Plaintiff needed rescue and feared harm, followed by D's immediate retrieval, Plaintiff's confinement and beating, staff monitoring, and police-lookout conduct plausibly establish knowing maintenance, harboring, assistance, and agreement with the traffickers—not mere negligence or failure to recognize generic indicators.
94. In the alternative, the responsible personnel and traffickers knowingly agreed to facilitate or protect the trafficking venture and took overt acts in furtherance of that agreement, including alerting D, monitoring Plaintiff's movements, maintaining rooms, and watching for police, constituting conspiracy under 18 U.S.C. § 1594(c).
95. The responsible corporate Defendant is liable for the conduct of employees and agents acting through assigned hotel functions and apparent authority to the extent the applicable employer, agency, ratification, or other vicarious-liability requirements are satisfied. Plaintiff also asserts direct liability against any Defendant whose own personnel

knowingly or recklessly participated in, supervised, ratified, concealed, or benefited from the § 1591 conduct with the required mental state.

96. Plaintiff may bring a civil action against perpetrators of Chapter 77 violations under § 1595(a) and is entitled to all damages, fees, costs, and relief available under that statute.

**COUNT III**

**CHILD ABUSE VICTIMS' RIGHTS ACT — 18 U.S.C. § 2255 (Against Defendants That Committed or Are Vicariously Liable for a Violation of 18 U.S.C. § 1591 While Plaintiff Was a Minor)**

97. Plaintiff incorporates all preceding paragraphs as though fully set forth here.

98. Plaintiff was a minor victim of violations of 18 U.S.C. § 1591 committed by the responsible hotel personnel and Defendants as alleged in Count II. She suffered personal injuries as a result.

99. The direct plea for help, Plaintiff's visible youth, the warning of impending harm, the trafficker's immediate retrieval, the confinement and beating, the monitoring of her movements, the stream of purchasers, and the multiple controlled girls and rooms support actual knowledge or reckless disregard that Plaintiff was a minor who would be caused to engage in commercial sex acts and that force or coercion was being used.

100. The responsible corporate Defendant or Defendants are vicariously liable for § 1591 violations committed by employees or agents only where the governing law permits such liability and the employment, agency, scope, and causation requirements are satisfied. Plaintiff principally pleads this theory as to the entity that employed the responsible 1701 University personnel, subject to confirmation of the property's corporate-owned status and payroll records.

101. Under 18 U.S.C. § 2255, Plaintiff is entitled to actual damages or statutory liquidated damages of $150,000, together with costs, reasonable attorney's fees and litigation costs, punitive damages, and appropriate preliminary and equitable relief. Plaintiff elects the measure of recovery that provides the greater lawful relief and does not seek duplicative recovery.

**COUNT IV**

**NEW MEXICO HUMAN TRAFFICKING CIVIL REMEDY — N.M. STAT. §§ 30-52-1 AND 30-52-1.1 (Against the Directly Responsible Defendants)**

102. Plaintiff incorporates all preceding paragraphs as though fully set forth here.

103. New Mexico law defines human trafficking to include knowingly recruiting, soliciting, enticing, transporting, or obtaining a person under eighteen with the intent or knowledge that the person will be caused to engage in commercial sexual activity, and knowingly benefiting from another person's commercial sexual activity with knowledge that force, fraud, or coercion was used.

104. The directly responsible Defendants, through the direct and vicarious conduct alleged according to their property-specific roles, knowingly maintained, harbored, facilitated, or benefited from Plaintiff's commercial sexual exploitation with knowledge of her minority, force, threats, fraud, or coercion. The direct plea, immediate retaliation, staff monitoring, violence, multiple rooms, multiple young girls, and police-lookout conduct support willful and malicious conduct as to the responsible 1701 University property-level actors and any entity legally answerable for that conduct.

105. Under N.M. Stat. § 30-52-1.1, Plaintiff is entitled to actual, compensatory, and punitive damages, injunctive or other appropriate relief, treble damages for willful and malicious actions, reasonable attorney's fees, and costs, without duplicative recovery.

**TOLLING AND TIMELINESS**

106. Plaintiff was a minor when much of the alleged trafficking occurred. Section 1595(c) permits filing by the later of ten years after accrual or ten years after the victim reaches eighteen. Plaintiff files within that period.

107. CAVRA provides that there is no time limit for filing an action under 18 U.S.C. § 2255. The 2022 elimination of the limitations period applies because Plaintiff's claim was not time-barred when that amendment became effective.

108. The New Mexico claim is timely under N.M. Stat. § 30-52-1.1(B), which allows a minor victim ten years after attaining eighteen to file. Plaintiff also invokes all applicable discovery, equitable-tolling, duress, fraudulent-concealment, incapacity, and statutory-extension doctrines to the extent necessary and permitted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants, jointly and severally to the extent permitted by law, and requests the following relief:

1. Compensatory damages, including economic and noneconomic damages, in an amount to be determined by the jury;
2. Actual damages or $150,000 in liquidated damages under 18 U.S.C. § 2255, as permitted by law and without duplicative recovery;
3. Punitive and exemplary damages in an amount sufficient to punish and deter;
4. Treble damages under N.M. Stat. § 30-52-1.1 for conduct found willful and malicious;
5. Past and future medical, psychological, psychiatric, substance-use-treatment, housing, rehabilitation, and life-care expenses;
6. Past and future lost earnings, lost earning capacity, and other economic loss;
7. Prejudgment and post-judgment interest;
8. Reasonable attorney's fees, litigation costs, and taxable costs under 18 U.S.C. §§ 1595 and 2255 and N.M. Stat. § 30-52-1.1;
9. Appropriate declaratory, injunctive, preliminary, and equitable relief;
10. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury on all the issues so triable.

By: /s/ *Russell Handy*
Russell Handy
Potter Handy LLP
1410 E. Winding Way Drive, Ste B
Friendswood, TX 77546
Phone: (415) 534-1911
Email: serveHT@potterhandy.com
*Counsel for Plaintiff*